**No. 23-4513**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DORIAN K. MYLES,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of West Virginia,
Case No. 1:23-cr-0021-TSK-MJA-1 (Chief District Judge Thomas S. Kleeh)

**MEMORANDUM BRIEF FOR APPELLANT DORIAN K. MYLES**

L. RICHARD WALKER
 *Counsel of Record*
SEAN B. SHRIVER
ELIZABETH B. GROSS
FEDERAL PUBLIC DEFENDER
230 W. Pike Street
Suite 360
Clarksburg, WV 26302
(304) 622-3823
richard_walker@fd.org

JENNESA CALVO-FRIEDMAN
TRISHA TRIGILIO
ANDREA WOODS
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
jcalvo-friedman@aclu.org

JUDITH P. MILLER
ALISON M. SIEGLER
FEDERAL CRIMINAL JUSTICE CLINIC
UNIVERSITY OF CHICAGO LAW SCHOOL
6020 S. University Ave.
Chicago, IL 60615
773-834-1598
jpmiller@uchicago.edu

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF THE ISSUE ..............................................................4

STATEMENT OF THE CASE ...............................................................5

I.    TWO COURTS DETERMINED THAT MYLES SHOULD BE
      RELEASED. ...............................................................................5

      A. A State Court Judge Ordered Release. ...................................5

      B. A Federal Magistrate Judge Ordered Release. .......................6

II.   THE COURT BELOW IMPROPERLY INTERPRETED THE
      PRESUMPTION OF DETENTION AND DETAINED MYLES. ...............8

III.  PEOPLE SUBJECT TO THE PRESUMPTION OF DETENTION DO NOT
      POSE A HIGHER RISK OF FLIGHT OR DANGER. ..........................10

STANDARD OF REVIEW ...................................................................11

ARGUMENT ......................................................................................11

I.    THE DETENTION ORDER MISINTERPRETED THE PRESUMPTION OF
      DETENTION. ............................................................................12

      A. The Presumption of Detention Is a "Bursting Bubble" that
         Disappears When the Defense Produces Evidence
         Supporting Release. ............................................................12

      B. Contrary Precedent Ignores the Plain Meaning of the
         Statutory Text. ...................................................................18

      C. Constitutional Avoidance Likewise Requires Interpreting the
         BRA's Presumption as a Bursting Bubble. ...........................22

II.   THE DETENTION ORDER VIOLATES DUE PROCESS. ....................23

      A. The Detention Order Violates Procedural Due Process. ........25

         1. Pretrial Liberty Is a Fundamental Right. ........................26

         2. The Presumption Sweeps Well Beyond Congress's
            Findings, Creating an Intolerable Risk of Erroneous
            Pretrial Detention. ......................................................27

            a. Congress's Findings Supporting the
               Presumption Were Limited to Major Drug
               Traffickers. ...........................................................29

            b. The Presumption Is Not Focused on Major
               Drug Traffickers. ...................................................32

            c. The Non-Bursting Bubble Presumption Used in
               this Case Undermines the Accuracy of
               Detention Procedures that Salerno Endorsed. ........38

3.  The Government Has No Legitimate Interest in Assigning Evidentiary Weight to an Unsupported Presumption. ............................................................42

B.  The Presumption Violates Substantive Due Process. ............................45

C.  The Two Opinions to Have Considered the Constitutionality of the Presumption Are Outdated and Wrong. ........................................46

III.  THIS COURT SHOULD RELEASE MYLES. ...........................................48

A.  The District Court Used the Incorrect Legal Standard, Requiring *De Novo* Review By this Court. ...............................................48

B.  The Law and the Evidence Demonstrate that the Presumption Is Rebutted and Pretrial Release Is Warranted in this Case. ..............................................................................50

1.  Myles's Success on State Pretrial Release Rebuts the Presumption and Strongly Favors Release. ...................................51

2.  Myles's Strong Family Ties, Community Ties, and Employment Plan Likewise Rebut the Presumption and Support Release. ......................................................................53

3.  Myles's Minimal Criminal History and the Fact That He is Not Charged with a Mandatory Minimum Further Rebut the Presumption and Support Release. ...................55

4.  Myles's Proposed Conditions of Release Will Reasonably Assure His Successful Compliance. ...........................56

CONCLUSION .......................................................................................................57

STATEMENT REQUESTING ORAL ARGUMENT ...........................................58

# TABLE OF AUTHORITIES

## Cases

*Addington v. Texas*, 441 U.S. 418 (1979) .................................................. 40, 41, 42

*Boos v. Barry*, 485 U.S. 312 (1988) .......................................................... 23

*Clark v. Martinez*, 543 U.S. 371 (2005) .................................................... 23

*Consolidation Coal Co. v. Local 1643*, 48 F.3d 125 (4th Cir. 1995) .................... 11

*Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261 (1990) ............................... 41

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ....................... 20

*Foucha v. Louisiana*, 504 U.S. 71 (1992) .............................................. 26, 40, 45

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021) ..... 18

*Hall v. United States*, 566 U.S. 506 (2012) ............................................... 13

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) ........................... 20

*Hurlbut v. Black*, 925 F.3d 154 (4th Cir. 2019) .......................................... 13

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001) ................................................... 23

*In re JKJ Chevrolet, Inc.*, 26 F.3d 481 (4th Cir. 1994) .................................. 19

*In re Yoder Co.*, 758 F.2d 1114 (6th Cir. 1985) .......................................... 16

*Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759 (2019) .......................................... 20

*Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314 (4th Cir. 2021) ................ 27, 42

*Legille v. Dann*, 544 F.2d 1 (D.C. Cir. 1976) ........................................ 14, 15

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......................................... passim

*McCann v. Newman Irrevocable Tr.*, 458 F.3d 281 (3d Cir. 2006) ....................... 17

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ................................. 17

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011) ........................................... 13

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ....................................... 41

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ........................................... 43, 44

*Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344 (4th Cir. 2020) ..... 13

*Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021) .......................................... 13

*Reeves v. Gen. Foods Corp.*, 682 F.2d 515 (5th Cir. 1982) ............................... 15

*Ross v. Blake*, 578 U.S. 632 (2016) ...................................................... 13

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)....................................14

*Santosky v. Kramer*, 455 U.S. 745 (1982) ........................................ 40, 42

*Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Cir. 1996)..........22

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .............................17

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ........................14

*Tenneco Chemicals, Inc. v. William T. Burnett & Co.*,
   691 F.2d 658 (4th Cir. 1982) ..................................................15

*Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981) ................. 14, 15, 16, 17

*United States v. Abad*, 350 F.3d 793 (8th Cir. 2003)..............................19

*United States v. Antone*, 742 F.3d 151 (4th Cir. 2014)...........................40

*United States v. Cook*, 880 F.2d 1158 (10th Cir. 1989)...........................19

*United States v. Dominguez,* 783 F.2d 702 (7th Cir. 1986)........................19

*United States v. Fortna,* 769 F.2d 243 (5th Cir. 1985) ..........................19

*United States v. Gamble*, 810 Fed. App'x 7 (D.C. Cir. 2020)......................19

*United States v. Gill*, No. 21-4502 (4th Cir. 2021)............................ 3, 50

*United States v. Goforth*, 546 F.3d 712 (4th Cir. 2008) .........................11

*United States v. Hawkins*, 617 F.2d 59 (5th Cir. 1980) ....................... 31, 32

*United States v. Hendrix*, 542 F.2d 879 (2d Cir. 1976) ..........................16

*United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008) ...........................19

*United States v. Hurtado,* 779 F.2d 1467 (11th Cir. 1985) .......................19

*United States v. Jessup*, 757 F.2d 378 (1st Cir. 1985).................... passim

*United States v. Martir*, 782 F.2d 1141 (2d Cir. 1986) ..........................19

*United States v. Pressley*, 359 F.3d 347 (4th Cir. 2004) ........................20

*United States v. Rodriguez*, 950 F.2d 85 (2d Cir. 1991)..........................19

*United States v. Salerno*, 481 U.S. 739 (1987)............................ passim

*United States v. Shabani*, 513 U.S. 10 (1994) ..................................14

*United States v. Simms*, 128 F. App'x 314 (4th Cir. 2005) ................. 11, 50

*United States v. Singh*, 860 F. App'x 283 (4th Cir. 2021).......................50

*United States v. Stewart*, 19 Fed. App'x 46 (4th Cir. 2001)................ 41, 49

- v -

*United States v. Stone*, 608 F.3d 939 (6th Cir. 2010) ............................................19

*United States v. Stricklin,* 932 F.2d 1353 (10th Cir. 1991) ...............................19

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ..............................16

*Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018) ..............................13

## Statutes

18 U.S.C. § 2 .......................................................................................................3

18 U.S.C. § 3142 ............................................................................................. 4, 24

18 U.S.C. § 3142(c)(1)............................................................................ 49, 50, 56

18 U.S.C. § 3142(e) ............................................................................................3

18 U.S.C. § 3142(e)(1) .................................................................................. 2, 27, 49

18 U.S.C. § 3142(e)(2)......................................................................................49

18 U.S.C. § 3142(e)(3) ................................................................................ passim

18 U.S.C. § 3142(f)..................................................................................... passim

18 U.S.C. § 3142(g) ................................................................................... passim

18 U.S.C. § 3142(g)(1)....................................................................... 51, 55, 56

18 U.S.C. § 3142(g)(3)................................................................... 51, 52, 53, 55

18 U.S.C. § 3142(g)(4).................................................................. 51, 52, 55, 56

18 U.S.C. § 3142(i)...........................................................................................43

18 U.S.C. § 3145(c) ............................................................................................3

18 U.S.C. § 3231 ................................................................................................3

18 U.S.C. § 3553(f) ...................................................................................... 35, 36

21 U.S.C. § 841(a)(1)..........................................................................................3

21 U.S.C. § 841(b)............................................................................................28

21 U.S.C. § 841(b)(1)(C)....................................................................................3

21 U.S.C. § 846 .................................................................................................3

28 U.S.C. § 1291...............................................................................................3

## Rules

Federal Rule of Criminal Procedure 5(c)(3)(C) ..........................................................6

Federal Rule of Criminal Procedure 5(d)(3) ..............................................................6

Federal Rule of Evidence 301 ................................................................... passim

## Legislative Materials

Bail Reform Act of 1984, Pub. L. 98-473, Title II, ch. I, 98 Stat 1837 ...................29

Bail Reform, Hearing on: S. 440, S. 482, S. 1253, S. 1554 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary, 97th Cong. (1981) ........... 29, 30, 31

Comprehensive Crime Control Act of 1983, S.1762, 98th Cong. (1984) ...............29

H.R. Rep. No. 93-1597 (1974) (Conf. Rep.),
    as reprinted in 1974 U.S.C.C.A.N. 7098 .........................................................21

H.R. Rep. No. 98-1159 (1984) (Conf. Rep.) .........................................................29

H.R.J. Res. 648, 98th Cong (1984) .......................................................................29

S. Rep. No. 93-1277 (1974), as reprinted in 1974 U.S.C.C.A.N. 7051 .................21

S. Rep. No. 98-225 (1983) ................................................................... 29, 31, 32, 36

## Other Authorities

Alison Siegler, Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis (2022) .........................................................................26

Am. L. Inst., Model Code of Evidence Rule 704(2) (1942) ...................................15

Amaryllis Austin, The Presumption for Detention Statute's Relationship to Release Rates, 81 Fed. Prob. 52 (2017) .................................................. passim

CPI Inflation Calculator, Bureau of Labor Statistics .............................................30

F. James & G. Hazard, Civil Procedure § 7.9, at 255 (2d ed. 1977) ......................15

John Henry Wigmore, Wigmore on Evidence § 2491 ............................................15

Jud. Conf. of the U.S., Report of the Proceedings of the Judicial Conference of the United States (2017) ...................................................................................... 11, 35

Matthew G. Rowland, Projecting Recidivism Rates for Federal Drug Offenders Released Early from Prison, 28 Fed. Sent'g Rep. 259 (2016) ............................37

Matthew G. Rowland, *The Rising Federal Pretrial Detention Rate, in Context*, 82 Fed. Prob. 13 (2018) .......................................................................35

McCormick on Evidence § 344 (3d ed. 1984) ........................................16

*Rebuttable Presumption*, *Black's Law Dictionary* 1068 (5th ed. 1979) ..................14

Stephen E. Vance, *Overview of Federal Pretrial Services Initiatives from the Vantage Point of the Criminal Law Committee*, 82 Fed. Prob. 30 (2018).... 10, 35

Thomas H. Cohen, Christopher T. Lowenkamp & William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary*, 82 Fed. Prob. 23 (2018) ................................................ 33, 34

U.S. Sent'g Comm'n, 2022 Annual Report and Sourcebook of Federal Sentencing Statistics (2022) .......................................................... 36, 37

U.S. Sent'g Comm'n, Guidelines Manual, § 3B1.1 (2018) ....................................37

Victoria F. Nourse, *A Decision Theory of Statutory Interpretation: Legislative History by the Rules*, 122 Yale L.J. 70, 118 (2012). .........................21

**INTRODUCTION**

Appellant Mr. Dorian Myles respectfully requests that this Court reverse the district court's order detaining him pretrial and revoking the magistrate judge's release order. The legal standard the district court used to detain Myles violates the statutory requirements of the Bail Reform Act of 1984 (BRA) and the constitutional right to due process. Two different judges—a Michigan federal magistrate judge and a West Virginia state court judge—determined that Myles should be released pretrial, notwithstanding the conduct alleged in this case. Myles's success on pretrial release for five months proves that those two judges were correct.

Because Myles was charged with drug trafficking offenses for which the maximum term of imprisonment is 10 years or more, the BRA subjects him to a rebuttable presumption of detention. The Michigan magistrate judge used the correct standard, found that the presumption had been rebutted, and ordered Myles released. After the government moved to revoke that release order, the district court found that Myles "did not rebut the presumption in favor of detention," and then relied in part on that finding to detain him. App.148.[1] But, properly interpreted, the BRA's presumption is what is known as a "bursting bubble"

---

[1] "App." refers to the Appendix to this memorandum brief, filed electronically as an attachment to the filing entry for the brief. *See* Scheduling Order, ECF No. 3.

- 1 -

presumption," that is, a presumption that *disappears entirely* once the defense produces evidence contesting detention. Myles rebutted this presumption by producing evidence supporting his release. His detention pending trial based on a purportedly unrebutted presumption therefore violates the plain text of the BRA, as well as due process.

Under the proper legal standard, Myles must be released. Myles presented extensive evidence establishing strong family and community ties, a history of gainful employment, and future employment prospects. Moreover, Myles has never been convicted of a felony, has no history of violence, and has never been to prison. He was released on state bond for the same underlying conduct without any violations for five months when he was first arrested on federal charges. Indeed, federal officers found him exactly where he told the state court he would be living, at his mother's home. Myles produced more than enough evidence to rebut the BRA's presumption, which therefore disappears and plays no further role in the detention analysis. Considering the evidence without the presumption, the government has not proven that "no condition or combination of conditions [of release] will reasonably assure" Myles's appearance or the safety of the community. 18 U.S.C. § 3142(e)(1); *see also* §§ 3142(f), (g). This Court should reverse the detention order and remand with instructions to release Myles with appropriate conditions.

In the alternative, this Court should issue a detailed opinion clarifying the proper legal standard before vacating and remanding to the district court for further proceedings. The Supreme Court has never passed on the proper interpretation of the BRA's presumption of detention nor the parameters of its constitutionality. Despite their importance, these are questions of first impression in this Circuit and ones that have remained largely unexamined in courts nationwide for forty years.

Given that the misinterpretation of the BRA's presumption is a reoccurring problem in this Circuit, *see, e.g.*, *United States v. Gill*, No. 21-4502 (4th Cir. Oct. 12, 2021), Myles respectfully requests that this Court aid in the administration of justice by clarifying the legal standards that apply to the presumption of detention in deciding this appeal.

## JURISDICTIONAL STATEMENT

The U.S. District Court for the Northern District of West Virginia has jurisdiction under 18 U.S.C. § 3231. Myles was indicted for violations of 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846. App.24-33.

On July 26, 2023, the district court revoked the magistrate judge's release order and detained Myles pretrial under 18 U.S.C. § 3142(e). App.147-149. Myles timely noticed his appeal on August 7, 2023. App.149-50. The U.S. Court of Appeals for the Fourth Circuit has jurisdiction under 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

During the hearing below, Myles produced evidence supporting his release. Nevertheless, the district court found that "Myles did not rebut the presumption in favor of detention arising under 18 U.S.C. § 3142(e)(3) based on the nature of his offenses," and detained Myles based in part on that finding, reversing the magistrate judge's release order. App.148.

The issue on appeal is whether the district court used the incorrect legal standard by assigning evidentiary weight to the statutory presumption of detention even though Myles produced evidence in support of release, in contravention of:

(a) the plain text of the federal Bail Reform Act of 1984, 18 U.S.C. § 3142;

(b) Myles's right to procedural due process under the Fifth Amendment of the United States Constitution; and

(c) Myles's right to substantive due process under the Fifth Amendment of the United States Constitution.

## STATEMENT OF THE CASE

### I.   Two Courts Determined That Myles Should Be Released.

Two different judges ordered Myles released pretrial. App.21; App.62:9-12. He complied with all of their conditions of release. App.62:1-8. Only the court below, which improperly interpreted the presumption of detention, determined that Myles should be detained.

### A.   A State Court Judge Ordered Release.

In January 2023, a West Virginia state court released Myles on bond after he was charged with drug trafficking. App.8; App.86:1-89:25.

Myles, who is 25 years old and African American, was released to his mother, Takeysha Daniels. App.117:14-118:15. She was, and remains, prepared to help Myles meet any terms of his pretrial release. App.123:11-20. She drove over twelve hours round-trip from Michigan to pick up Myles the day he was released on the West Virginia state charges. App.119:20-120:23. Two days later, she drove him back to West Virginia for state court again.

Myles complied with the terms of his state bond for five months until he was arrested on federal charges. App.62:1-8. Meanwhile, in May 2023, a federal grand jury in the Northern District of West Virginia indicted Myles for a series of controlled substances charges. App.2; App.24-33. The federal charges and the January state court charges were based on the same alleged conduct. App.24. There

is no allegation that Myles committed new criminal conduct or violated bond conditions while released in the state case.

In June 2023, Myles was arrested for the federal charges, which do not carry a mandatory minimum penalty. App.2; App.24. At that time, Myles had successfully complied with state pretrial release for five straight months. App.61:23-62:8. When officers arrested Myles on federal charges, they found him exactly where he told the West Virginia state court he would be—at home with his mother in Michigan. App.123:4-10.

### B.    A Federal Magistrate Judge Ordered Release.

Because Myles was arrested in Michigan on federal charges filed in West Virginia, a federal magistrate judge in the Eastern District of Michigan held an in-person hearing to determine whether he should be released. Fed. R. Crim. Pro. 5(c)(3)(C), (d)(3). The U.S. Pretrial Services Office recommended release. App.44:1. At the Michigan hearing, the government's presentation centered on the presumption of detention triggered by Myles's charges. The AUSA began: "this is a presumption of detention case." App.39:20-21. The government acknowledged that Pretrial Services "recommend[ed] a bond with conditions," but urged the magistrate judge to instead consider the facts "in light of the presumption." App.43:25-44:3. And in its rebuttal argument, the government again relied on the

"presumption" in arguing that "that no combination of conditions could ensure his appearance or ensure the safety of the community." App.55:18-21.

The Michigan magistrate judge rejected the government's arguments, finding that "although there is a presumption in favor of detention in this case, the presumption has been successfully rebutted." App.56:6-8. According to the record, the presumption played no further role in the judge's detention determination.

Having found the presumption rebutted, the judge noted "[t]hat doesn't end the story of course," and considered the four release factors under 18 U.S.C. § 3142(g). App.56:9-10. After carefully considering each factor, the court ordered Myles released under conditions that would reasonably assure his appearance and community safety App.62:9-12:

> [O]ne of the things I'm blessed with in this case is that I have some history of you being on bond. . . . In this particular case, you were on i[t]—from January until you were indicted in May and then you were arrested recently. There is no indication of a bond violation. There is also no indication that you failed to report. You were found where you were supposed to be. And so that all cuts in your favor.

App.61:23-62:8. At the government's request, the magistrate court immediately stayed its release order pending review by the district court in the Northern District of West Virginia. App.69:9-12; 71:24.

- 7 -

## II.    The Court Below Improperly Interpreted the Presumption of Detention and Detained Myles.

The government filed a two-page motion in the District Court for the Northern District of West Virginia seeking to revoke the release order and to stay release pending review. App.74. The district court stayed the release order and scheduled a hearing. App.81-82. At the beginning of the hearing, on July 25, 2023, the district court recognized that this is a "presumption case," identifying it as "the usual burden-shifting quagmire where the Government has filed a motion for detention that's a *de novo* review and rebuttable presumption case." App.85:19-22.

During the hearing, Myles produced extensive evidence supporting release. Myles's mother, Takeysha Daniels, testified that Myles lives with her, and that she and other family members can support Myles in complying with all conditions of release. App.117:21-118:2; App.123:14-16. Six family members and Myles's girlfriend traveled from Michigan to West Virginia for his bond hearing. App.121:5-7. Ms. Daniels testified that she previously drove from Michigan to West Virginia to post Myles's state court bond and bring him home, and did the same drive a few days later to bring him to a court appearance in West Virginia. 120:3-120:23. She likewise would continue to drive her son to court and otherwise help ensure that he meets any terms of his release. App.120:25-121:3. Ms. Daniels also testified that Myles is an experienced construction worker and that he has a

job waiting at his cousin's construction company, where Myles previously worked glazing bathtubs and building porches. 121:11-122:7.

Myles showed, through a Pretrial Services officer, that he has a minimal, non-violent criminal history and zero felony convictions. App.110:5-114:22; *accord* App.60:13-14. In fact, the Michigan magistrate judge previously emphasized that "all of [Myles's] convictions up to this point have been for misdemeanors." The Pretrial Services Officer likewise established that Myles's alleged failures to appear mostly dated to his teenager or near-teen years, and all pertained to misdemeanors or traffic cases. App.110:5-112:7. And, through an exhibit, Myles showed that he had spent five months on pretrial release in state court for the same underlying conduct, during which time he did not violate any terms of his bond. App.8-23. Myles's evidence is described further in Part III.

The district court recognized that Myles's history and characteristics established significant evidence supporting release. App.142:4-12. Nevertheless, the court explicitly found that Myles "did not rebut the presumption in favor of detention arising from 18 U.S.C. § 3142(e)(3) based on the nature of his offenses." App.142:13-144:17; App.148. The judge then also found that "the United States met its burden of proving that no condition or combination of conditions of release would reasonably assure Myles's presence . . . and reasonably assure the safety of

any other person and the community . . . ." App.148. Based on all of these findings, the court ordered that Myles be detained pending trial. App.148.

## III.  People Subject to the Presumption of Detention Do Not Pose a Higher Risk of Flight or Danger.

People subject to the BRA's presumption of detention do not categorically pose a higher risk of danger or flight that might justify a thumb on the scale in favor of detention. To the contrary, the presumption encompasses nearly all people charged with drug offenses. Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 Fed. Prob. 52, 55 & tbl.1 (2017).[2] A robust body of evidence that shows the presumption extends far beyond the wealthy, internationally-connected major drug traffickers identified in congressional findings as justifying the presumption. As the U.S. Pretrial Services Office has observed, "a sizeable segment of low-risk defendants . . . are being detained as a result of the statutory presumption of detention." Stephen E. Vance, *Overview of Federal Pretrial Services Initiatives from the Vantage Point of the Criminal Law Committee*, 82 Fed. Prob. 30, 33 (2018).[3]

---

[2] https://www.uscourts.gov/sites/default/files/81_2_7_0.pdf [https://perma.cc/BL9D-D7LC].

[3] https://www.uscourts.gov/sites/default/files/82_2_4_0.pdf.

The Judicial Conference of the United States recommended eliminating the presumption in most drug cases because it "unnecessarily increas[es] detention rates of low-risk defendants, particularly in drug trafficking cases." Jud. Conf. of the U.S., Report of the Proceedings of the Judicial Conference of the United States 10 (2017).[4]

## STANDARD OF REVIEW

Because the district court used the wrong legal standard, this Court's review of its detention order is *de novo*. *United States v. Goforth*, 546 F.3d 712, 714 (4th Cir. 2008); *see also United States v. Simms*, 128 F. App'x 314, 315 (4th Cir. 2005) (citing *Consolidation Coal Co. v. Local 1643*, 48 F.3d 125, 128 (4th Cir. 1995)).

## ARGUMENT

Myles was detained under an incorrect interpretation of the rebuttable presumption of detention triggered by drug charges ("the presumption"). *See* 18 U.S.C. § 3142(e)(3)(A). This misinterpretation of the presumption conflicts with both the plain language of the BRA and Myles's constitutional right to pretrial liberty. Accordingly, Myles respectfully requests that this Court reverse the detention order and order the district court to release him pending trial.

---

[4] https://www.uscourts.gov/sites/default/files/17-sep_final_0.pdf [https://perma.cc/2GFW-LZUA].

I.     **The Detention Order Misinterpreted the Presumption of Detention.**

The district court's detention order relied on the presumption of detention and concluded, wrongly, that Myles failed to rebut the presumption. App.148. The presumption of detention is satisfied when the defendant produces evidence supporting release; at that point, the presumption is rebutted as a matter of law and must play no further role in the detention hearing. With the presumption rebutted, the judge then proceeds to consider release or detention under the usual standard. Interpreting the presumption to impose any higher burden, as the district court did here, conflicts with the plain meaning of the BRA. The canon of constitutional avoidance also supports interpreting the BRA to give effect to its text, because the alternative raises serious due process concerns.

   A.     **The Presumption of Detention Is a "Bursting Bubble" that Disappears When the Defense Produces Evidence Supporting Release.**

The BRA imposes a presumption that pretrial detention is warranted for nearly all people facing drug charges, "subject to rebuttal by the person" charged. § 3142(e)(3). Such a presumption is known as a "bursting bubble" presumption because it effectively "bursts" or *disappears* upon the defense producing evidence rebutting it, and no longer carries any weight after rebuttal. The BRA uses the word "presumption" without expressly stating whether it is a "bursting bubble" presumption that disappears upon rebuttal, or whether it is a "non-bursting bubble"

presumption that remains as evidence even after rebuttal. However, the plain meaning of the BRA compels interpreting that statute's presumption as a "bursting bubble" presumption.

"Statutory interpretation . . . begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016); *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020). This rule requires courts "to afford the law's terms their ordinary meaning at the time Congress adopted them" by looking to "'all the textual and structural clues' bearing on that meaning." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) (quoting *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)). Only where the meaning of a given term is ambiguous may courts look beyond the text of the statute to its legislative history and purpose. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *Hurlburt v. Black*, 925 F.3d 154, 164 (4th Cir. 2019).

At the time of the BRA's passage, rebuttable presumptions were regarded as bursting bubbles under the dictionary definition, common law, and contemporaneous interpretations of other presumptions. Nothing in the BRA suggests that its rebuttable presumption should be treated any differently. *See Hall v. United States*, 566 U.S. 506, 523 (2012). Against this plain language backdrop, courts are "hardly . . . free to assume a contrary position." *Legille v. Dann*, 544

F.2d 1, 6-7 (D.C. Cir. 1976) (holding "bursting bubble" interpretation is the "prevailing view").

Looking first to the dictionary, rebuttable presumptions burst (disappear) upon production of evidence. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 567 (2012) (directing courts to consult the "then-current edition of Black's Law Dictionary"). At the time of the BRA's passage, *Black's Law Dictionary* defined "rebuttable presumption" to mean a bursting bubble presumption: "Once evidence tending to rebut the presumption is introduced, the force of the presumption is entirely dissipated." *Rebuttable Presumption*, *Black's Law Dictionary* 1068 (5th ed. 1979).

Common law at the time of the BRA's enactment parallels the dictionary's definition. It is a well-established "rule that a common law term in a statute comes with a common law meaning, absent anything pointing another way." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 (2007); *accord United States v. Shabani*, 513 U.S. 10, 13 (1994) ("[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms.").

Just four years before the passage of the BRA, the Supreme Court held that, at common law, "[t]he word 'presumption' properly used refers only to a device for allocating the production burden." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 n.8 (1981) (quoting F. James & G. Hazard, Civil Procedure § 7.9, at

255 (2d ed. 1977)) (citing *inter alia* Fed. R. Evid. 301; 9 J. Wigmore, Evidence § 2491 (3d ed. 1940)). Courts cannot give "artificial probative force to a presumption . . . when the opponent has come forward with *some* evidence to the contrary." John Henry Wigmore, Wigmore on Evidence § 2491, at 306 (Chadbourn rev. 1981) (emphasis in original). Once this burden of production is met, "the presumption drops from the case." *Burdine*, 450 U.S. at 255 n.10.

Similarly, almost simultaneously with the BRA's enactment, this Court held: "It is axiomatic that a presumption is not evidence and *disappears* in the face of evidence sufficient to rebut it." *Tenneco Chemicals, Inc. v. William T. Burnett & Co.*, 691 F.2d 658, 663 (4th Cir. 1982) (emphasis added). Other circuits contemporaneously concluded the same. The D.C. Circuit observed that the bursting bubble approach was "the prevailing view," including "the view of the Supreme Court, . . . the approach taken by the Model Code of Evidence and, very importantly, by the newly-adopted Federal Rules of Evidence." *Legille*, 544 F.2d at 6-7 (collecting cases); *see also* Am. L. Inst., Model Code of Evidence Rule 704(2) (1942) ("[When] evidence has been introduced . . . the existence, or non-existence of the presumed fact is to be determined exactly as if no presumption had ever been applicable."). The Fifth Circuit similarly held that the bursting bubble approach was "simply a restatement of 'a traditional feature of the common law.'" *Reeves v. Gen. Foods Corp.*, 682 F.2d 515, 522 n.10 (5th Cir. 1982) (quoting

*Burdine*, 450 U.S. at 255 n.8). The Second Circuit agreed that the bursting bubble approach "is favored by most authorities in the field of evidence." *United States v. Hendrix*, 542 F.2d 879, 882 (2d Cir. 1976). As summarized in an authoritative treatise published the same year as the BRA's enactment, "[t]he most widely followed theory of presumptions in American law [was] . . . the 'bursting bubble' theory," which "had been adopted . . . in countless [then-]modern decisions." McCormick on Evidence § 344, at 974 (3d ed. 1984).

Two lines of case law contemporaneous with the BRA's enactment further demonstrate that its presumption is a bursting bubble that disappears after the defense produces some contrary evidence. First, then-recently enacted Federal Rule of Evidence 301 (concerning civil presumptions) exemplified the default rule that presumptions are bursting bubbles. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (explaining then-contemporaneous default rules are a relevant source for plain-text interpretation). Like the BRA, Federal Rule of Evidence 301 used the word "presumption" without expressly stating whether it bursts upon rebuttal or instead remains as evidence. Courts nonetheless interpreted Rule 301's presumption as a bursting bubble, consistent with common law. By the time the BRA was enacted, "[m]ost commentators ha[d] concluded that Rule 301 as enacted embodies the . . . 'bursting bubble' approach." *In re Yoder Co.*, 758 F.2d 1114, 1119 (6th Cir. 1985) (collecting sources). This view of Rule 301 as a

bursting bubble presumption remains "widely accepted" today. *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 288 (3d Cir. 2006) (collecting cases).

Second, the *McDonnell Douglas* Title VII burden-shifting framework, developed over a period that includes the passage of the BRA in 1984, reflects the Supreme Court's explanation for how "all" presumptions operate. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Burdine*, 450 U.S. 248. The Supreme Court explained that the function of a "presumption is . . . that a finding of the predicate fact . . . produces a required conclusion in the absence of explanation." *St. Mary's*, 509 U.S. at 506 (quotation omitted). The *McDonnell Douglas* framework "*operates like all presumptions*" to leave "the ultimate burden of persua[sion] . . . at all times with the plaintiff." *Id.* at 507 (quotation & alteration omitted) (emphasis added). So, if a plaintiff raises a presumption of discrimination, to "rebut the presumption" the defense need only "produc[e] evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254. In other words, the Title VII defendant need not *disprove* the presumption—only produce evidence to contest it. Once the defense produces that evidence, the presumption disappears entirely: it "is no longer relevant" and "simply drops out of the picture." *St. Mary's*, 509 U.S. at 510, 511; *see also Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1966

(2021) (Gorsuch, J., concurring) ("[The Supreme] Court has long recognized that a '"presumption" properly used refers only to a device for allocating the production burden'" and once the Title VII "defendant produces such evidence [of rebuttal], the presumption 'drops from the case.'" (citation omitted)). As Justice Gorsuch recently observed, "nearly 'all presumptions' operate in this way." *Id* . (Gorsuch, J., concurring) (citation omitted).

In sum, at the time the BRA was enacted, rebuttable presumptions were by default bursting bubbles—presumptions that disappeared after the defense carried its burden of production. Given there is no statutory language to the contrary, the plain meaning of the BRA's presumption is a bursting bubble presumption.

## B.  Contrary Precedent Ignores the Plain Meaning of the Statutory Text.

Applying standard canons of statutory interpretation, the plain meaning of the statute is clear: the rebuttable presumption of detention disappears—it carries no weight—once the defendant produces rebuttal evidence. To the extent that other circuits disagree, those cases are based on flawed reasoning from a single First Circuit case: *United States v. Jessup*, 757 F.2d 378 (1st Cir. 1985). *Jessup* held, contrary to the plain language of the statute, that the BRA's presumption of detention is not a bursting bubble and retains evidentiary weight even if the defense produces evidence to rebut it. *Id.* at 383.

- 18 -

While other circuits have adopted *Jessup*'s conclusion, none has engaged in independent analysis of this issue.[5] In a similar context, where out-of-circuit caselaw "essentially relied on [one flawed opinion] with little analysis," this Court has willingly departed from other circuits and insisted that that "the plain meaning of the statute must be given effect." *In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 485, 486 (4th Cir. 1994). It should do so here.

*Jessup*'s statutory holding was wrong for two reasons. First, its central analysis improperly prioritized legislative history and purpose at the expense of the statutory text. Second, *Jessup* gets the legislative history and purpose wrong.

First, *Jessup* did not begin its interpretation of the presumption with the BRA's text, but instead with the court's own view of the statute's ostensible purpose. Skipping over any textual analysis, *Jessup* asserted that the bursting bubble approach "could undercut the legislative purpose in creating the presumption (say, an intent to have courts follow the legislature's assessment of

---

[5] *See Jessup*, 757 F.2d at 382; *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991); *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986); *United States v. Fortna,* 769 F.2d 243, 250-51 (5th Cir. 1985); *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir. 1986); *United States v. Abad*, 350 F.3d 793,797 (8th Cir. 2003); *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *United States v. Stricklin,* 932 F.2d 1353, 1354-55 (10th Cir. 1991); *United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989); *United States v. Hurtado,* 779 F.2d 1467, 1470 n.4 (11th Cir. 1985); *United States v. Gamble*, 810 Fed. App'x 7, 8 (D.C. Cir. 2020).

probabilities or the furtherance of some other specific public policy).” *Jessup*, 757

F.2d at 383; *id.* at 383-84. Notably, *Jessup* offered no citation to the statutory text

for this claim.

Methodologically, *Jessup's* reasoning “g[ot] the inquiry backward” by

starting with the statute’s ostensible purpose rather than its text. *Jam v. Int’l Fin.*

*Corp.*, 139 S. Ct. 759, 769 (2019). When the statutory text “yields a clear

answer”—as it does here—“judges must stop.” *Food Mktg. Inst. v. Argus Leader*

*Media*, 139 S. Ct. 2356, 2364 (2019); *see, e.g.*, *United States v. Pressley*, 359 F.3d

347, 350 (4th Cir. 2004). The statute’s text is the law, not its alleged purpose.

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017). Even judges

“who sometimes consult legislative history will never allow it to be used to

‘muddy’ the meaning of ‘clear statutory language.’” *Food Mktg.*, 139 S. Ct. at

2364. By skipping past the text to rely on the statute’s supposed purpose (drawn

from legislative history), *Jessup*’s interpretation of the BRA “is a relic from a

‘bygone era of statutory construction.’” *Id.* (citation omitted).

Second, even if the statutory text were ambiguous and looking at legislative

history were appropriate, *Jessup* got that history wrong. Unfortunately, the BRA’s

legislative history does not acknowledge—much less answer—the question of

whether the presumption is a bursting bubble. To get around that issue, *Jessup*

instead looked to the legislative history of Federal Rule of Evidence 301. But as

explained above, the enacted version of Rule 301 provides no support for—and in fact, runs contrary to—*Jessup*'s interpretation of the presumption.

*Jessup* erred by mistakenly relying on a *rejected* version of Rule 301 to conclude that the presumption is a non-bursting bubble. *See Jessup*, 757 F.2d at 383. The opinion accurately quoted a House report criticizing bursting bubble presumptions, *id.*, but did not acknowledge that the Conference Committee explicitly rejected the House's view in favor of the Senate's bursting bubble approach to Rule 301. *See* H.R. Rep. No. 93-1597 (1974) (Conf. Rep.), *as reprinted in* 1974 U.S.C.C.A.N. 7098, 7099 ("Conference adopts the Senate amendment."); S. Rep. No. 93-1277 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7051, 7056 ("[T]he committee has deleted that provision of the House-passed rule that treats presumptions as evidence.") (citation omitted)). "In Congress, winning and losing matters."[6] Simply put, the bursting bubble version of Rule 301 won, and this Court should not replicate *Jessup*'s mistaken reliance on the losing version. Like Rule 301, the "most reasonable interpretation" of the BRA's presumption "is that it incorporates the 'bursting bubble' theory." *See Sheridan v. E.I. DuPont de*

---

[6] Victoria F. Nourse, *A Decision Theory of Statutory Interpretation: Legislative History by the Rules*, 122 Yale L.J. 70, 118 (2012).

*Nemours & Co.*, 100 F.3d 1061, 1081 (3d Cir. 1996) (Alito, J., concurring in part and dissenting in part) (concluding same for Rule 301).

The *Jessup* court further claimed that a bursting bubble presumption would be "virtually meaningless." 757 F.2d at 383. That claim is wrong: the presumption imposes a burden of production that defendants in non-presumption cases do not face. And judges also retain abundant discretion to detain defendants who successfully rebut the presumption. For example, when a major drug trafficker poses an unmitigable risk of flight or danger, the government will ordinarily have little difficulty meeting its burden, and the court will order detention—even if the presumption is rebutted. *See id.* at 383-84. A bursting bubble presumption simply means that a court may not consider *the rebutted presumption itself* as evidence, and instead must rely—as it does in every case where the presumption is not implicated—on its individualized evaluation of the 18 U.S.C. § 3142(g) factors.

In sum, *Jessup*'s interpretation of the BRA's presumption as a non-bursting bubble was wrong. This Court should not follow its wrongheaded analysis.

## C.    Constitutional Avoidance Likewise Requires Interpreting the BRA's Presumption as a Bursting Bubble.

If there were any ambiguity in the plain meaning of the BRA's rebuttable presumption, constitutional avoidance requires interpreting it as a bursting bubble. Any more expansive interpretation of the presumption would violate due process for the reasons discussed in the following Section, or at the very least would raise

- 22 -

"serious constitutional problems." *I.N.S. v. St. Cyr*, 533 U.S. 289, 300 (2001). As

such, this Court is "obligated to construe the statute to avoid such problems." *Id.*

To invoke constitutional avoidance, Myles need not show that the district

court's interpretation of the statute violates due process, or that Myles's

interpretation is the best interpretation. "The canon is not a method of adjudicating

constitutional questions by other means." *Clark v. Martinez*, 543 U.S. 371, 381

(2005). Instead, "[i]t is a tool for choosing between competing plausible

interpretations of a statutory text." *Id.*; *see also Boos v. Barry*, 485 U.S. 312, 331

(1988) ("[T]he federal courts have the duty to avoid constitutional difficulties by

doing so if such a construction is fairly possible.").

Here, the bursting bubble construction is not only plausible, it is the best

interpretation of the text. The Court should avoid serious due process problems by

construing the presumption as a bursting bubble.

## II.    The Detention Order Violates Due Process.

The district court found that Myles "did not rebut the presumption in favor

of detention," App.148, even though he produced evidence supporting release. In

other words, the court improperly interpreted the BRA's presumption as a *non-*

bursting bubble presumption. That interpretation is not only inconsistent with the

- 23 -

plain language of the statute, but also violates the Fifth Amendment's Due Process Clause.[7]

Specifically, interpreting the presumption as a non-bursting bubble undermines the accuracy of the detention procedures that the Supreme Court deemed constitutional in *United States v. Salerno*, 481 U.S. 739 (1987). The presumption as written sweeps far beyond congressional findings, which were limited to major drug traffickers, to include many low-risk defendants. It is fundamentally unfair to require courts to consider this inaccurate presumption after a defendant produces individualized rebuttal evidence. Notwithstanding limited out-of-circuit precedent to the contrary, this misinterpretation of the BRA flips the statute's otherwise narrow scheme on its head, violating the Supreme Court's mandate that "liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Id.* at 755.

_____

[7] The constitutional due process arguments in Section II are limited to the presumption that arises under 18 U.S.C. § 3142(e)(3)(A) that applies to people, like Myles, who are charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. § 951 et seq.), or chapter 705 of title 46."

## A.    The Detention Order Violates Procedural Due Process.

Myles's detention under a non-bursting bubble presumption violates procedural due process because his detention was not "implemented in a fair manner." *Salerno*, 481 U.S. at 746 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). To determine whether a procedure for depriving someone of liberty is constitutionally adequate, the Court must consider (1) the private interest at stake and (2) the risk that the procedures used will result in the erroneous deprivation of that private interest, as well as the probable value of additional procedural safeguards; against (3) the government's interest, including the administrative burdens of additional procedures. *Mathews*, 424 U.S. at 335. The Supreme Court cited this test in *Salerno*, 481 U.S. at 751, to uphold the BRA's ordinary procedures for pretrial detention based on dangerousness.[8]

The question posed here is whether layering a non-bursting bubble presumption on top of those procedures unjustifiably increases the risk of erroneous pretrial detention. Each *Mathews* factor tells us the answer is yes: (1) Myles's private interest in pretrial liberty is fundamental; (2) the non-bursting bubble presumption dramatically increases the risk of erroneous detention because

---

[8] *Salerno* did not address the presumption of detention at issue in this appeal. 481 U.S. at 745 n.3. ("We intimate no view on the validity of any aspects of the Act that are not relevant to respondents' case.").

it lacks evidentiary support; and (3) the government has no legitimate interest in requiring a court to consider a largely unsupported presumption after a defendant has produced rebuttal evidence.

### 1. *Pretrial Liberty Is a Fundamental Right.*

The first step of the *Mathews* framework considers "the private interest" at stake—here, the right to pretrial liberty. 424 U.S. at 335. *Salerno* recognized the right to pretrial liberty as "fundamental." 481 U.S. at 750. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause . . . ." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

The "strong interest in liberty" prior to trial is intrinsically important, *Salerno*, 481 U.S. at 750, but it also has practical consequences extending beyond detention itself. Pretrial detention increases the likelihood that an individual will be convicted, plead guilty, and receive a longer sentence. *See* Alison Siegler, *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis* 67-68 (2022) (collecting sources).[9] "Every day that a defendant remains in custody, he or she may lose employment, which in turn may lead to a loss of housing. These financial pressures may create a loss of community ties." Austin, *supra*, at 53.

---

[9] https://freedomdenied.law.uchicago.edu/report [https://perma.cc/Q8W8-SJDL].

- 26 -

Given every individual's strong liberty interest, *Salerno* held that "extensive [procedural] safeguards" are required to ensure that pretrial detention is "implemented in a fair manner." 481 U.S. at 752, 746 (citing *Mathews*, 424 U.S. at 335).

> ### 2. *The Presumption Sweeps Well Beyond Congress's Findings, Creating an Intolerable Risk of Erroneous Pretrial Detention.*

The second *Mathews* factor is "the risk of an erroneous deprivation" of the private liberty interest caused by using a non-bursting bubble presumption, and the likely "value" of alternative procedures in reducing that risk. *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 325, 327 (4th Cir. 2021).

Here, the "substitute procedural safeguards," *Mathews,* 424 U.S. at 335, are simply the ones that *Salerno* itself endorsed. *Salerno* squarely held that procedural due process is satisfied by an ordinary BRA detention hearing without a presumption, *see* 481 U.S. at 751-52, where the court analyzes the § 3142(g) release factors to determine whether the government has carried its burden of meeting the § 3142(e)(1) detention standard, *see id.* at 742. And *Salerno* teaches that these readily-available procedures "are specifically designed to further the accuracy of [the detention] determination." 481 U.S. at 751.

A non-bursting bubble presumption increases the risk of erroneous detention because the presumption does not meaningfully track people who pose an unmitigable high risk of flight or dangerousness. The challenged presumption

applies to nearly everyone facing federal drug charges. For example, the presumption applies to those who sell any amount of Schedule I, II, or III drugs, with exceptions only for marijuana.[10] Ninety-three percent of federal drug offenses are presumption cases. Austin, *supra*, at 55, 60. The presumption sweeps far more broadly than Congress's findings—which were limited to major drug traffickers— to encompass many low-risk defendants, while failing to reliably track higher-risk defendants. Against this backdrop, requiring courts to assign weight to the presumption, even in the face of rebuttal evidence, increases the risk of erroneous liberty deprivations. It substitutes an unsupported charge-based presumption for individualized consideration of the § 3142(g) factors and effectively lowers the government's evidentiary burden.

---

[10] The presumption applies to any controlled substance offense carrying a statutory maximum greater than 10 years in prison. 18 U.S.C. § 3142(e)(3). With limited exceptions, all controlled substance offenses fall into that category. *See* 21 U.S.C. § 841(b) (setting sentence schedule for all drug crimes). For example, all cocaine, crack cocaine, oxycodone, codeine, anabolic steroids, and other Schedule I, II, and III drug trafficking charges, except certain marijuana offenses, are subject to the presumption of detention because they carry a maximum sentence of 10 years or more imprisonment. *Compare* §§ 841(b)(1)(A)-(E) *with* §§ 841(b)(1)(D), (b)(4).

        *a. Congress's Findings Supporting the Presumption Were Limited to Major Drug Traffickers.*

Congress passed the challenged presumption based on sparse evidence about rich major drug traffickers who had the means, motivation, and international connections to flee the country easily. Congress's findings were limited to two sources, and were discussed in Senate Report 98-225.[11]

First, as to risk of flight, the Senate Judiciary Report discussing the presumption drew heavily on the testimony of Florida Senator Lawton Chiles, who emphasized Florida's unique role as "the national port of entry" at the height of the Medellin cartel's international drug trade.[12] Senator Chiles testified that individual revenues from drug transactions ran up to $1.5 million per month (in 2023

---

[11] Senate Report 98-225 provides the explanation of the text of the presumption that is closest in time to the legislative enactment. S. Rep. No. 92-225 (1983). The text of the presumption was passed by the Senate as part of the Comprehensive Crime Control Act of 1983, S.1762, 98th Cong. (1984), accompanied by Senate Report 98-225 on February 2, 1984. That text was added to H.R.J. Res. 648, 98th Cong (1984), and passed as part of the conference report, H.R. Rep. No. 98-1159, at 113 (1984) (Conf. Rep.), and became part of the Bail Reform Act of 1984, Pub. L. 98-473, Title II, ch. I, 98 Stat 1837. The Supreme Court and circuits around the country rely on Senate Report 98-225 as the most probative piece of legislative history about the BRA. *See Salerno,* 481 U.S. at 742, 747, 750; *see, e.g.*, *Hurtado*, 779 F.2d at 1472.

[12] S. Rep. No. 98-225, at 20 & n.58 (1983) (citing *Bail Reform, Hearing on: S. 440, S. 482, S. 1253, S. 1554 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary,* 97th Cong. 56-60 (1981) (Statement of Sen. Lawton Chiles)).

dollars).[13] According to the Senator, access to these resources meant that major drug traffickers "will never appear in court."[14] Senator Chiles further emphasized that "major drug traffickers," for whom forfeiting bond "translates into no more than a temporary business loss," presented "a very special situation" requiring "specially crafted legislation[.]" *Id.* at 59.

In addition to his testimony, Senator Chiles appended a pretrial services report that further underscores the uniqueness of any flight risk problem in the Southern District of Florida. The report describes the financial value of the drug transactions at issue in that district as "immense—many times greater than the volume and dollar value of drugs per defendant . . . nationally." *Id.* at 78. The report also noted that "length of time in the community [] and criminal history" distinguish "defendants in the Southern District of Florida who fail to appear [from] those in [other] districts." *Id.* The report concluded that Southern District of Florida "drug defendants" released on bond failed to appear for court approximately eight times more often than "drug defendants" in other districts, *id.*

---

[13] The Bureau of Labor Statistics' CPI-based inflation calculator shows that $500,000 in January 1984 is the equivalent to $1,499,955.84 in July 2023. *CPI Inflation Calculator*, Bureau of Labor Statistics, data.bls.gov/cgi-bin/cpicalc.pl?cost1=500%2C000&year1=198401&year2=202307.

[14] *Bail Reform, Hearing on: S. 440, S. 482, S. 1253, S. 1554 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 97th Cong. 57 (1981) (Statement of Sen. Lawton Chiles).

at 65; outside the Southern District of Florida, appearance rates for "drug defendants" matched the average rates for people facing other charges (two percent failure-to-appear rate), *id*. at 64.

Nonetheless, based on Senator Chiles's testimony *alone*, the Senate Judiciary Committee Report recommended a nationwide presumption of detention for "major drug traffickers" charged with "a grave drug offense" for whom drug trafficking is "extremely lucrative," and who "have both the resources and foreign contacts to escape to other countries with relative ease[.]" S. Rep. No. 98-225, at 20. The Report concluded that such defendants posed an unusual risk of flight sufficient to necessitate a rebuttable presumption of detention. *Id*.

As for dangerousness, Congress cited nothing more than one Fifth Circuit decision, *United States v. Hawkins*, 617 F.2d 59 (5th Cir. 1980). *See* S. Rep. No. 98-225, at 20 n.59. As with the pretrial services report entered into the congressional record by Senator Chiles, *Hawkins* undermines rather than supports the assumptions on which the presumption rests. *Hawkins* approved of the concept that a defendant who had already been convicted can pose a danger to the community while his appeal was pending because he might continue trafficking drugs while on release. *Id.* at 61. But it did so based on individualized factual findings, including that the defendant had evidently not severed ties with major drug traffickers, because he had no "legitimate source of funds," but nevertheless

- 31 -

maintained an expensive lifestyle while on bail pending trial and acquired a "cattle ranch for fine cattle." 617 F.2d at 60-61. *Hawkins* expressly rejected the government's argument that "the single fact that [the defendant] has engaged in one drug conspiracy, by itself, is sufficient basis for a conclusion that the risk of repetition is a danger to the community that supports denial for bail." *Id. a*t 61.

Nevertheless, with this citation as its only support, Congress postulated that that "[p]ersons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism." S. Rep. No. 98-225, at 20. Congress thus concluded that major drug traffickers are universally likely to present a danger to the community. Irrespective of the wisdom of that conclusion, the presumption as written extends far beyond major drug traffickers.

### b.  The Presumption Is Not Focused on Major Drug Traffickers.

Despite the limitations of Congress's findings, the presumption Congress passed attaches to nearly *all* people charged with federal drug offenses. Ninety-three percent of defendants charged with federal drug offenses are presumption cases. Austin, *supra*, at 55. But only a tiny fraction of the individuals to whom the presumption attaches can be considered the kinds of major international drug traffickers whom Congress found pose an especially high unmitigable risk of flight

or danger. Four decades of data following the presumption's passage reinforce that it is not narrowly focused on major drug traffickers, including: (1) Pretrial Risk Assessment (PTRA) scores, (2) rates of statutory safety valve eligibility, (3) role adjustments under the Sentencing Guidelines, and (4) post-conviction financial data on presumption defendants. Each of these sources shows that the presumption typically applies to defendants who are *not* the type of major drug traffickers described in Congress's findings. Instead, the presumption is a wildly inaccurate charge-based proxy for risk.

*First*, the advent of the PTRA shows that the presumption fails to meaningfully track who poses a high risk of nonappearance or danger. The PTRA was implemented in 2010, approximately twenty-six years after the passage of the presumption. Thomas H. Cohen, Christopher T. Lowenkamp & William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary*, 82 Fed. Prob. 23, 23 (2018).[15] Unlike the presumption's reliance on charge alone, the PTRA is an actuarial tool that is used to predict the risk of nonappearance and rearrest based on eleven factors. *Id.* at 24. The PTRA categorizes each person into one of five risk categories; all people in the same

---

[15] https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf [https://perma.cc/T3YK-TKXP].

category are predicted to pose similar actuarial risks of nonappearance or rearrest. *Id*.

The Administrative Office of the U.S. Courts (AO) released a study in 2018 that compared PTRA scores to the presumption. That study's two major results undermine any claim that the presumption meaningfully tracks risk of nonappearance or danger *at all*—let alone by identifying major drug traffickers. *See* Austin, *supra*, at 60-61. By categorizing federal defendants by PTRA score (i.e., risk of nonappearance or rearrest), the study showed that the BRA subjects many people to the presumption who are at the *lowest* risk of nonappearance or rearrest. *Id.* at 55-56, 60. The study concluded that the presumption is "overly broad" for precisely this reason: rather than narrowly focusing on high-risk defendants, the presumption applies to many defendants across all risk categories. *Id.* at 60; *see also id.* at 56 fig.2.

Another troubling conclusion of the AO study is that the presumption increases the likelihood of detaining the lowest-risk people. *Id.* at 60. For two people in the same low-risk PTRA category, the person subject to the presumption is *more* likely to be detained, simply because their case is categorized as a presumption case. *Id.* at 57. For people in higher risk categories, by contrast, the presumption makes "no difference" to detention rates. *Id*.; *see id.* at 60 ("[T]he effect of the presumption on actual release rates and on the recommendations of

- 34 -

pretrial services officers was most significant for low-risk defendants (meaning there may be some level of unnecessary detention), while having a negligible effect on the highest risk defendants.").

In short, "the presumption . . . unnecessarily increas[es] pretrial detention rates" overall because it increases the likelihood of detaining "a sizeable segment of low-risk defendants" who "tend to be successful on pretrial supervision[.]" Vance, *supra*, at 33 (Chief, Criminal Law Policy Staff, AO Probation & Pretrial Services Office); *accord* Matthew G. Rowland, *The Rising Federal Pretrial Detention Rate, in Context*, 82 Fed. Prob. 13, 17 (2018) (Chief, AO Probation & Pretrial Services Office) ("Research indicates that the enumerated offenses [in the presumption] may not be the best predictors of risk of flight or danger to the community."). Notably, the Judicial Conference of the United States agrees: it recommends eliminating the presumption in most drug cases because the presumption "unnecessarily increas[es] detention rates of low-risk defendants, particularly in drug trafficking cases." Jud. Conf. of the U.S., supra, at 10.

*Second*, the widespread use of statutory "safety valve" reductions in federal drug cases demonstrates that the presumption applies to many people who are, by definition, not major drug traffickers. The statutory safety valve relieves people from mandatory minimum sentences when their criminal history and underlying conduct are deemed less serious. *See generally* 18 U.S.C. § 3553(f)(1)-(4). Forty

percent of the people sentenced for drug trafficking offenses who faced mandatory

minimums in 2022 received the benefit of this statutory safety valve. *See* U.S.

Sent'g Comm'n, 2022 Annual Report and Sourcebook of Federal Sentencing

Statistics 121 tbl.D-13 (2022).[16] The statutory safety valve, by definition, is

unavailable to high-risk major drug traffickers engaged "in the business of

importing or distributing dangerous drugs"—the people identified in Congress's

findings to support the presumption. S. Rep. No. 98-225 at 20; § 3553(f)(2) (cannot

have used or threatened violence), §§ 3553(f)(1), (f)(4) (cannot have "engaged in a

continuing criminal enterprise"). And yet every person who received a statutory

safety valve reduction was subject to the BRA's presumption of detention at the

outset of their case, demonstrating that the presumption improperly attaches to

many low-risk individuals.

  *Third*, role adjustments under the Sentencing Guidelines further demonstrate

that the presumption sweeps in many people who are not major drug traffickers. In

2022, approximately 20 percent of people subject to the presumption received a

*mitigating* role adjustment for their lesser role in the offense. U.S. Sent'g Comm'n,

---

[16] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/2022-Annual-Report-and-Sourcebook.pdf [https://perma.cc/KZ3E-LN55]. This percentage was calculated by dividing the number of drug mandatory minimum cases *with safety valve* in 2022 (5,046) by the total number of all drug mandatory minimum cases in 2022 (5,046+7,543).

2022 Annual Report, supra, at 117 tbl.D-9. By comparison, only about six percent of those convicted of drug trafficking received an *aggravating* role adjustment. *Id.* And this six percent figure overstates the number of ostensible major drug traffickers because the aggravating role adjustment applies to any "manager or supervisor" not just an "organizer or leader." U.S. Sent'g Comm'n, Guidelines Manual, § 3B1.1 (Nov. 2018). These sentencing data suggest that only a small percentage of federal drug defendants are the major drug traffickers.

*Fourth*, defendants' financial status at the end of their cases further confirms that many are not the wealthy international drug traffickers who Congress identified. Thirty-eight percent of people convicted of federal drug charges have difficulty maintaining stable housing, and "more than a quarter . . . are under significant financial stress." Matthew G. Rowland, *Projecting Recidivism Rates for Federal Drug Offenders Released Early from Prison*, 28 Fed. Sent'g Rep. 259, 260 (2016). Yet most of these people were subject to a presumption of detention at the outset of their cases. *See* Austin, *supra*, at 55; *id.* at 56 fig.2. Again, the overall population of people charged with federal drug crimes does not resemble the high-flying Miami drug traffickers on whom Senator Chiles's testimony focused, and who were the subject of Congress's findings.

These statistics show that the presumption is not carefully limited to the major drug traffickers who were the subject of congressional findings. Instead, the

presumption that attaches to people facing drug charges is a wildly inaccurate charge-based proxy for risk.

> c. *The Non-Bursting Bubble Presumption Used in this Case Undermines the Accuracy of Detention Procedures that Salerno Endorsed.*

Against the foregoing background, the second *Mathews* factor—the risk of erroneous deprivations of liberty—weighs heavily in favor of finding that a non-bursting bubble presumption violates procedural due process. Giving weight to the challenged presumption, even in the face of rebuttal evidence, treats all people subject to the presumption as if they pose the same risks as major international drug traffickers. Reading the statute to require a non-bursting bubble presumption thus necessarily increases the danger of erroneous detention. The inaccurate presumption undermines what is otherwise a fully individualized detention determination. It likewise puts an unsupported thumb on the scale in favor of detention, effectively lowering the government's burden of proof.

*Salerno* approved the BRA's general detention framework precisely because it was "specifically designed to further the accuracy" of the detention determination and not a "scattershot attempt to incapacitate those who are merely suspected of [ ] serious crimes." 481 U.S. at 750-51. No one can be detained based on "future dangerousness" without an individualized showing that the specific "arrestee presents an identified and articulable threat to an individual or the

- 38 -

community." *Id.* at 751. To that end, the Court highlighted the many ways in which

the BRA's detention framework mandates individualized consideration of the facts

of someone's case: (1) a defendant's ability to present their own evidence, *id.* at

751; (2) the judge's individualized consideration of "the nature and the

circumstances of the charges, the weight of the evidence, the history and

characteristics of the putative offender, and the danger to the community," *id.* at

751-52 (citing § 3142(g)); and (3) the government's burden to "muster[]

convincing proof" that, considering these § 3142(g) factors, "no conditions of

release can reasonably assure the safety of the community or any person," *id.* at

750 (citing § 3142(f)); *accord id.* at 752. *Salerno* concluded that, taken together,

these procedures ensure that only the right individuals are detained pretrial—those

who *actually* pose an unmitigable risk of flight or danger that outweighs their

personal liberty interest. *See id.* at 751.

By contrast, a non-bursting bubble approach necessarily introduces error

into the individualized detention framework described above by assigning weight

to the presumption even where the defense produces evidence supporting release.

First, under a non-bursting bubble presumption, no amount of individualized

evidence supporting release stops the presumption from carrying weight. *Contra*

*Salerno*, 481 U.S. 751. Second, a non-bursting bubble presumption undermines the

court's individualized consideration of the enumerated statutory factors. And third,

with a non-bursting bubble presumption, the government need offer no proof at all—let alone "convincing" proof—about the presumption's factual accuracy in each case. *Id.* at 750; *accord id.* at 752. If the presumption accurately tracked risk, incorporating it into all cases might maintain the accuracy of *Salerno*'s detention hearing framework. But it plainly does not.

Giving weight to the presumption after individualized rebuttal evidence has been introduced likewise effectively lowers the government's burden of persuasion. *See Addington v. Texas*, 441 U.S. 418, 423, 433 (1979) (observing that "[t]he standard [of proof] serves to allocate the risk of error between the litigants" and requiring "equal to or greater than the 'clear and convincing' standard" for civil commitment). As to dangerousness, requiring a court to consider the unsupported and rebutted presumption undermines *Salerno*'s holding that the government bears the burden of *proving* dangerousness by clear and convincing evidence. *See Salerno*, 481 U.S. at 750-752 (citing § 3142(f)). Notably, the Supreme Court has never permitted civil detention of citizens for dangerousness based on anything less than clear and convincing evidence. *See, e.g.*, *Foucha*, 504 U.S. at 86 (dangerousness of insanity acquittees); *Addington*, 441 U.S. at 433 (dangerousness for civil commitment); *United States v. Antone*, 742 F.3d 151, 159 (4th Cir. 2014) (dangerousness for civil commitment); *see generally Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (discussing Court's requirement of clear and

- 40 -

convincing evidence "when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money' (quoting *Addington*, 441 U.S. at 425)); *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 282-83 (1990) (explaining Court has required, at minimum, clear and convincing evidence for deportation, denaturalization, civil commitment, termination of parental rights, allegations of civil fraud, and other civil matters)).[17]

A similar problem arises with nonappearance risk: relying on the unsupported and rebutted presumption to cross the evidentiary threshold effectively means lowering the government's burden to *less than a preponderance of the evidence*. *See United States v. Stewart*, 19 Fed. App'x 46, 48 (4th Cir. 2001) (interpreting statute to require preponderance of the evidence showing). By relying on the presumption, the court can order detention when the government has not presented enough individualized evidence to meet the preponderance standard. The

---

[17] In part of an opinion in a case that involves noncitizen detention and reflects the reasoning of one judge, this Court found that the district court erred in ignoring Supreme Court law that has allowed the government to "presume detention categorically." *Miranda v. Garland*, 34 F.4th 338, 363 (4th Cir. 2022). In support, it drew a comparison to the BRA's presumption by claiming the presumption shifts the burden of *persuasion* to the defense. *Id. Miranda*'s comment about the presumption is dicta, and besides, it is wrong. If fact, the Supreme Court and every circuit to consider it have held the presumption does *not* shift the burden of persuasion. *See Salerno*, 481 U.S. at 745 n.3; cases cited *supra* note 5. In any event, it has no bearing in this case, which does not involve immigration.

Supreme Court has never permitted courts to order detention of citizens based on so low a standard.

Ultimately, by requiring courts to treat every arrestee as if they pose the same risks as a major drug trafficker, a non-bursting bubble presumption undermines the accuracy of the detention procedures that *Salerno* endorsed. Where a person's pretrial liberty is at stake, that increased risk of error is intolerably high. *See Addington*, 441 U.S. at 423-24. The Supreme Court has made clear that "the social cost of even occasional error is sizable" when a constitutional right such as the right to pretrial liberty is involved. *See Santosky*, 455 U.S. at 764.

Accordingly, for the reasons discussed above, the second *Mathews* factor— risk of erroneous deprivation—weighs heavily in favor of finding that a non-bursting bubble presumption violates procedural Due Process.

### 3.    *The Government Has No Legitimate Interest in Assigning Evidentiary Weight to an Unsupported Presumption.*

The third *Mathews* factor further weighs in favor of finding that a non-bursting bubble presumption violates procedural due process. Here, the government has no "countervailing interests" in requiring a court to assign weight to the presumption after the defense has rebutted the presumption by presenting evidence. *Kirk*, 987 F.3d at 327. Irrespective of the presumption, the government's general interests in preventing pretrial flight and danger are already adequately served by the BRA's ordinary detention framework, as affirmed in *Salerno*.

- 42 -

Congress's findings identify the government's narrower interest in the presumption itself as curbing the especially high risks of flight and danger posed by the limited class of major international drug traffickers. However, four decades of the government's own data show that the challenged presumption does not apply only—or even primarily—to high-risk major drug traffickers. The government accordingly has no legitimate interest in having a court consider a rebutted presumption at a detention hearing. Instead, treating the presumption as a bursting bubble actually advances the government's interest in promoting basic fairness and avoiding the cost and societal harms of unnecessary incarceration. *See Morrissey v. Brewer*, 408 U.S. 471, 483-84 (1972).

Nor would prohibiting courts from treating the presumption as a non-bursting bubble impose any notable "administrative burden[]." *Mathews*, 424 U.S. 335. Regardless of the weight given to the presumption, the defense is still entitled to a detention hearing. § 3142(f). Both parties must investigate the § 3142(g) factors to prepare for that hearing, and, at the hearing, can call witnesses, cross-examine them, present argument, and so on, regardless of whether the government relies on the presumption. *See* §§ 3142(g), (f). And in all cases, the Court is required to issue a written order to detain someone that "include[s] written findings of fact and a written statement of the reasons for the detention." *Id.* at § 3142(i)(1).

- 43 -

No doubt, requiring courts to consider a rebutted presumption makes it easier for the government procure a detention order, by putting a thumb on the scale in favor of detention. But the government's administrative burdens are alleviated far more when the law helps people maintain a "normal and useful life within the law" and treats them with "basic fairness." *Morrissey*, 408 U.S. at 484. Needlessly detaining people exacts tremendous social and economic costs, including the cost of unnecessary incarceration. *Id.* at 483-84 & n.10 (agreeing that the cost of unnecessary imprisonment outweighs the cost of robust parole revocation procedures). By "becom[ing] an almost de facto detention order for almost half of all federal cases . . . the presumption has contributed to . . . the over-detention of low-risk defendants," exacting the costs of "pretrial incarceration on the community, and the significant burden of pretrial detention on the taxpayers." Austin, *supra,* at 61. The procedural protection Myles seeks reinforces the government's interest in minimizing the costs of detention and more than satisfies the *Mathews* balancing test—it is a win/win.

In sum, the *Mathews* test weighs decidedly in Myles' favor. Myles has an "importan[t] and fundamental" interest in his right to pretrial liberty. *Salerno*, 481 U.S. at 750. Assigning weight to the presumption *itself*, even after Myles produced rebuttal evidence, increased the likelihood that Myles would be erroneously detained. This error prevented individualized consideration of the BRA's release

factors, effectively lowering the government's burden of proof. Finally, the government has no legitimate interests to outweigh the individual's interest in liberty and the procedural interest in increased accuracy. In short, properly interpreting the presumption as a bursting bubble presumption makes detention determinations more accurate and costs the government and taxpayers less money, with no increased administrative burden on either the parties or the court.

For all these reasons, interpreting the BRA's presumption as a non-bursting bubble presumption violates procedural due process.

**B.      The Presumption Violates Substantive Due Process.**

A pretrial detention scheme must be "narrowly focus[ed] on a particularly acute problem in which the Government interests are overwhelming." *Salerno*, 481 at 750; *Foucha*, 504 U.S. at 81 (striking down a civil commitment statute that was "not carefully limited" by comparison to the "sharply focused scheme at issue in *Salerno*"). This substantive standard is stringent—it protects "the individual's strong interest in liberty," which the *Salerno* Court recognized as "importan[t] and fundamental." 481 U.S. at 750.

Here, the presumption is not sharply focused on *any* specific problem "in which the Government interests are overwhelming," much less a "particularly acute problem." *Salerno*, 481 U.S. at 750. For the reasons discussed above, the challenged presumption lacks a "narrow[] focus[]"—or any focus—between the

- 45 -

group described in congressional findings (major international drug traffickers) and the group subject to the presumption (almost anyone charged with a federal drug offense). *See id.* (focusing on what Congress "specifically found"). Relying on the presumption as a substantive consideration, even after the defense has produced evidence to rebut it, therefore violates substantive due process.

### C.     The Two Opinions to Have Considered the Constitutionality of the Presumption Are Outdated and Wrong.

As with the statutory interpretation of the BRA, the First Circuit in *Jessup* again offers a frequently cited case on the constitutionality of the presumption. *See Jessup*, 757 F.2d at 387. The Eleventh Circuit uncritically followed *Jessup* in the only other appellate case to address the issue. *See Medina*, 775 F.2d at 1402-03. This Court should decline to follow *Jessup*'s due process holdings because, like *Jessup*'s statutory holdings, they depend entirely on an unwarranted deference to the meager legislative findings.

*Jessup* was wrong in holding that a non-bursting bubble presumption of detention provides constitutionally adequate procedural protections. *Jessup*'s procedural due process analysis was limited by a scant record: the case was decided only a year after the BRA's passage, when the First Circuit was hesitant to "reevaluate the statistical studies or other evidence presented at congressional hearings." *Jessup*, 757 F.2d. at 386. Relying on nothing more than the two sources cited in the Senate Judiciary Committee Report (and a reference to the failed

- 46 -

version of Fed. R. Evid. 301, *supra* at Section I.B), *Jessup* concluded that requiring courts to consider the presumption even after a defendant introduces individualized rebuttal evidence would not "significantly increase the risk of an 'erroneous deprivation' of liberty." *Id.* (citing *Mathews*, 424 U.S. at [335]). For the reasons discussed above, that is incorrect. The evidence shows that the presumption's bite is reserved for people in the *lowest* risk categories. The presumption makes *no* difference to the high-risk defendants it was supposed to target and instead results in erroneous detention of low-risk defendants who pose little risk of flight or danger. Austin, *supra*, at 57-58.

 *Jessup*'s substantive due process analysis was incorrect for similar reasons. Even assuming the accuracy of Congress's findings, *Jessup* did not respond to *Salerno*'s substantive question, namely, whether the presumption as written was "narrowly focus[ed]" on the problem Congress "specifically found[.]" *Salerno*, 481 U.S. at 750. As discussed above, plainly it is not. Unlike the *Jessup* court, this Court has access to decades of government data demonstrating that the presumption is not narrowly or otherwise focused on the risky major international drug traffickers Congress's findings described.

 In sum, requiring courts to consider the unsupported presumption of detention even after the defense has produced rebuttal evidence violates procedural and substantive due process. Out-of-circuit precedent to the contrary should be

rejected for its erroneous use of legislative history and purpose, as well as its failure to account for the absence of evidence supporting the presumption.

The BRA's presumption is a bursting bubble presumption that disappears from consideration once the defense introduces rebuttal evidence. The plain text of the statute demands as much. The legal dictionary, common law, treatises, case law, and constitutional avoidance all confirm that bursting bubble presumptions are the default, and the text of the BRA offers no reason to vary. Four decades of government data show that the presumption as written applies to a broad swath of low-risk defendants charged with drug crimes who bear little similarity to the major international drug traffickers that were the subject of Congress's findings in support of the presumption.

Requiring courts to consider the presumption in the face of rebuttal evidence to the contrary violates the Bail Reform Act and the fundamental right to pretrial liberty. That approach should be squarely rejected as a matter of law.

III.    **This Court Should Release Myles.**

    A.    **The District Court Used the Incorrect Legal Standard, Requiring *De Novo* Review By this Court.**

The court below employed the wrong legal standard in its detention order, revoking the Michigan magistrate judge's release order. The detention inquiry in a presumption case like Myles's should proceed in two steps. First, the court must assess whether the person has rebutted the presumption. If the person presents

evidence supporting release, the court must find the presumption rebutted as a matter of law. Once the presumption is rebutted, the bubble bursts and the presumption entirely disappears from the analysis. From that point forward, the court may not consider the presumption.

At the second step of the analysis, the court must determine whether the government has carried its ultimate burden of proof under § 3142(e)(1). Detention is warranted only if the government proves (1) by "clear and convincing evidence," § 3142(f), that there exist "no condition or combination of conditions [of release that] will reasonably assure" community safety, § 3142(e)(1), or (2) by at least a preponderance of the evidence that there exist no conditions of release that will reasonably assure the person's appearance in court, *see United States v. Stewart*, 19 Fed. App'x 46, 48 (4th Cir. 2001).[18] The court must consider the individualized factors set forth in § 3142(g), consider all available conditions of release in § 3142(c)(1), and "shall order the pretrial release of the person . . . subject to the

_____

[18] There are serious questions about whether a preponderance standard for flight risk is interpretively correct or constitutional, and this Court has never upheld such a standard in a published decision. *See* Jaden M. Lessnick, *Pretrial Detention by A Preponderance: The Constitutional and Interpretive Shortcomings of the Flight-Risk Standard*, 89 U. Chi. L. Rev. 1245 (2022); Marty Berger, *The Constitutional Case for Clear and Convincing Evidence in Bail Hearings*, 75 Stan. L. Rev. 469 (2023).

least restrictive . . . combination of conditions" that will reasonably assure

appearance and safety, *id.* The rebutted presumption plays no role in the analysis.

The court below erred and used the wrong legal standard. Myles produced

evidence supporting release, which was sufficient to rebut the presumption.

However, the district court erroneously found that "Myles did not rebut the

presumption in favor of detention," and cited that conclusion in support of its

detention order. App.148. This was error.

### B. The Law and the Evidence Demonstrate that the Presumption Is Rebutted and Pretrial Release Is Warranted in this Case.

This Court's review is *de novo*, and it conducts its "own review of the facts

as found by the district court." *Simms*, 128 F. App'x at 315. Using the correct legal

standard, the government has not come close to carrying its burden of proof to

detain Myles, and therefore Myles must be released. *See, e.g.*, *United States v.*

*Singh*, 860 F. App'x 283, 284 (4th Cir. 2021) (reversing district court and ordering

release "based on [this Court's] review of the record and consideration of the four

§ 3142(g) factors," "subject to appropriate conditions to be prescribed by the

district court"); *United States v. Gill*, No. 21-4502 (4th Cir. Oct. 12, 2021)

(reversing and remanding with instructions to release appellant where district court

erroneously held she had not rebutted the presumption).

At the first step of the analysis, Myles has presented extensive evidence that more than rebuts the presumption, including: (1) Myles's five months of success on state pretrial release for the same alleged underlying conduct, § 3142(g)(3)(A), (g)(3)(B), (g)(4); (2) Myles's tight family and community ties and concrete employment plan, § 3142(g)(3)(A); (3) the fact that Myles has no felony convictions, no history of violence, and has never been sentenced to prison, § 3142(g)(3)(A); and (4) the fact that Myles's alleged offense does not carry a mandatory minimum penalty, § 3142(g)(1), (g)(4). Given this evidence, the Court must find the presumption rebutted. Because the presumption is a bursting bubble presumption, the presumption then disappears entirely from consideration. At the second step of the analysis, the same facts that rebut the presumption also demonstrate that there are conditions of release that will reasonably assure the safety of the community and Myles's appearance in court.

### 1.    *Myles's Success on State Pretrial Release Rebuts the Presumption and Strongly Favors Release.*

Most importantly, Myles's resounding success on pretrial release in the West Virginia state case definitively (1) rebuts the presumption, and (2) establishes that there exist conditions of release that can "reasonably assure" both the safety of the community and Myles' appearance in court.

For the five months leading up to his federal arrest, Myles was on bond in state court *for the same alleged underlying conduct* as in this case. App.8-App.23.

- 51 -

During that time, he appeared at a court date in West Virginia state court and resided at home with his mother—exactly where he said he would be. App.119:20-120:2, 120:14-23, 123:4-10. Since his release in the state case, Myles has had zero violations, and his state court file shows no allegations of new or additional criminal conduct while on release from the West Virginia state case. *See* App.99:8-22 (receiving exhibit); App.8-App.23. In fact, in releasing Myles, the Michigan magistrate judge stated: "[T]here is no indication of a bond violation in any case you have ever had." App.62:1-2.

It is hard to imagine stronger evidence supporting release. First, Myles's compliance on the West Virginia state bond rebuts the presumption, especially when combined with his employment history, employment prospects, family support, community ties, and lack of felony convictions. Second, his adherence to conditions of release and lack of new criminal conduct relates directly to several of the § 3142(g) factors—most notably, demonstrating that his release will not endanger the community under § 3142(g)(4). Myles's success also establishes his "record concerning appearance at court proceedings" and good "character" under § 3142(g)(3)(A). Myles's proven track record on release standing alone, shows that there *are* conditions of release that provide the requisite reasonable assurance—the government certainly hasn't met its burden to prove otherwise.

- 52 -

### 2. Myles's Strong Family Ties, Community Ties, and Employment Plan Likewise Rebut the Presumption and Support Release.

Myles's demonstrated "family ties," "community ties," "length of residence in the community," "employment" history and prospects, and educational history under § 3142(g)(3)(A) also (1) rebut the presumption, and (2) will reasonably assure both the safety of the community and his appearance in court.

Myles just turned twenty-five years old and is a Detroit high school graduate. App.118:20-21, 123:23. His extended family lives in the Detroit area. *See* App.121:4-7, 122:2-5. He has no passport. App.121:8-9. He lives with his mother and sister in the Detroit home his mother owns and that he helped fix up. App.118:7-9. Even the Michigan AUSA recognized Myles's "residentially[] strong ties to the Detroit community." App.50:11-12.

Myles's mother, Takeysha Daniels, is a stable and responsible presence in his life. She "work[s] with the little babies in preschool" for the early childhood program of the Detroit Community School District. App.118:13-16. Moreover, Myles's mother has already proven her commitment to helping her son attend court as required. She testified that she would make sure that "Myles would be at court at every court hearing." App.121:3. In January, when Myles was released on state court bond, Ms. Daniels drove twelve hours round-trip to pick Myles up in West Virginia, and made the same drive a few days later to bring him back for court.

App.120:3-23. She testified that it is important to her that when her son is "on bond conditions that [she] do everything [she] can to help him meet those conditions." As she explained, "I believe in being responsible and doing things right. And, yes, that's why we made it back down here to that court date." App.123:14-19. She further testified that she would make that same trip with him for the federal case. *Id.*

Myles's family's presence at his federal detention hearing also shows that he would have extensive family and community support if released. In addition to his mother, five other members of his family, and his girlfriend, attended the detention hearing. App.121:4-7. Myles's girlfriend also made the long trip to court to support him, just as she did for his state detention hearing. App.120:3-8. It is the rare individual who has seven supporters present in court for a *local* detention hearing, much less one that requires a twelve-hour round-trip drive.

Myles's future employment prospects and employment history also rebut the presumption and reasonably assure appearance and safety. His mother testified that Myles has a job waiting for him if he is released on bond. If released, Myles will not be at loose ends nor be tempted to seek income through other means, both potential concerns in a drug case. *See* App.44:9-15 (AUSA arguing same). Instead, Myles will be working for his cousin at Myles Home Improvement, where he has previously spent summers building porches and patio decks and working on

- 54 -

concrete and winters doing home improvement, such as glazing bathtubs.
App.121:12-122:1. This job will occupy Myles's time and further ensure that he
complies with the conditions of release. Any misstep would risk not only losing his
job and going to jail but also damaging his cousin's business. Working for a family
business, especially given Myles's tight family ties, provides additional incentive
to adhere to the conditions of release.

Myles's track record of successful employment likewise supports release.
Ms. Daniels testified that Myles previously worked at Whole Foods and Ford
Fields. App.121:11-12. The Michigan magistrate judge relied on this work history
in releasing Myles, comparing him favorably to other defendants "who are your
age who have not done anything" for employment. App.60:1-4.

### 3.    *Myles's Minimal Criminal History and the Fact That He is Not Charged with a Mandatory Minimum Further Rebut the Presumption and Support Release.*

Myles relatively minimal criminal history under § 3142(g)(3)(A) and the
non-mandatory nature of his offense under § 3142(g)(1) & (g)(4), further rebut the
presumption and support his release. Most notably, Myles has no prior felony
convictions, no history of violence, and has never before been incarcerated in
prison. As the Michigan magistrate judge observed when releasing Myles: "[A]ll
of [Myles's] convictions up to this point have been for misdemeanors." App.60:13-
14. Nor is there any allegation of criminal misconduct in the five months during

which Myles was on pretrial release in the West Virginia state case. In addition,

while serious, these charges do not carry any mandatory minimum, indicating that

on the spectrum of federal drug charges, the alleged conduct is truly low-level.

App.24; *see also* § 3142(g)(1) (nature and circumstances of the offense);

§ 3142(g)(4) (nature and seriousness of the danger posed by release).

Allegations of stale failures to appear are not to the contrary. *Contra*

App.144:11-13. Several of these failures to appear were from misdemeanor or

traffic cases that were ultimately dismissed. App.110:5-112:7 (discussing criminal

history). App.45:21-46:2. Most of the alleged failures to appear are from when

Myles was still a teenager or barely out of his teenage years. 57:22-24. Much has

changed since then—he has worked steady jobs and has fully complied with his

conditions of release in the West Virginia case. In releasing Myles, the Michigan

magistrate judge found that he "has matured in that regard" and now "know[s]

enough to show up for court." App.57:23-24.

### 4.    *Myles's Proposed Conditions of Release Will Reasonably Assure His Successful Compliance.*

The BRA requires this Court to consider every available condition of release

and impose the least restrictive conditions that will reasonably assure compliance.

§ 3142(c)(1). Myles proposes a package of conditions that will reasonably assure

his appearance and the safety of the community, along with any other conditions

the Court deems necessary. His travel will be restricted to the Eastern District of

Michigan (where he lives), the Northern District of West Virginia, and points in between to travel to court. App.139:20-22. He will be required to secure employment, and he already has a stable home and good job lined up. App.139:23-25. He will not be permitted to leave his home except to attend court, go to work, and attend faith-based services. App.140:6-7. If the Court deems location monitoring to be necessary, such a stricture would provide additional assurance. App.140:4. He also proposes a no-contact order with the co-defendants in his case and a $10,000 unsecured bond. App.139:17; App.139:15-16; App.140:8-11.

For these reasons, Myles has rebutted the presumption and the government has not carried its burden.

## CONCLUSION

For the reasons stated above, this Court should reverse the detention order and remand with instructions to release Myles immediately with appropriate conditions. Release is especially appropriate given the magistrate judge's bond hearing, which was conducted under the correct legal standard and includes careful factual findings. In the alternative, Myles requests that this Court vacate the district court's detention order and remand for proceedings on the question of release. In any event, an opinion clarifying the correct legal standard and holding that the BRA's presumption is a "bursting bubble" will aid the administration of justice.

## STATEMENT REQUESTING ORAL ARGUMENT

Oral argument is warranted here because it would assist this Court in resolving the novel legal questions presented by this appeal, some of which involve questions of first impression in this Circuit.

August 23, 2023                    Respectfully submitted,

                                   /s/ L. Richard Walker
                                   *Counsel of Record*
                                   L. RICHARD WALKER
                                   SEAN B. SHRIVER
                                   ELIZABETH GROSS
                                   FEDERAL PUBLIC DEFENDER
                                   230 W. Pike Street
                                   Suite 360
                                   Clarksburg, WV 26302
                                   (304) 622-3823
                                   richard_walker@fd.org

                                   JENNESA CALVO-FRIEDMAN
                                   TRISHA TRIGILIO
                                   ANDREA WOODS
                                   AMERICAN CIVIL LIBERTIES UNION
                                   125 Broad Street, 18th Floor
                                   New York, NY 10004
                                   Jcalvo-friedman@aclu.org

                                   JUDITH P. MILLER
                                   ALISON M. SIEGLER
                                   FEDERAL CRIMINAL JUSTICE CLINIC
                                   UNIVERSITY OF CHICAGO LAW SCHOOL
                                   6020 S. University Ave.
                                   Chicago, IL 60615
                                   773-834-1598
                                   jpmiller@uchicago.edu

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because—according to the word-count feature of the word-processing program with which it was prepared (Microsoft Word)—the brief contains 12,990 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

/s/ L. Richard Walker
L. RICHARD WALKER

*Counsel of Record*

## CERTIFICATE OF SERVICE

I electronically filed the foregoing on August 23, 2023, using the Court's

appellate CM/ECF system, which effected service on all counsel of record.

/s/ L. Richard Walker

L. RICHARD WALKER

*Counsel of Record*